The PEOPLES NATIONAL BANK OF CHARLOTTESVILLE, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 395.

United States District Court
W. D. Virginia, at Charlottesville.
March 27, 1956.

Thomas J. Michie, Charlottesville, Va., for plaintiff.

B. F. Sutherland, Asst. U. S. Atty., Roanoke, Va., Robert E. Manuel, Attorney, Tax Division, Dept. of Justice, Washington, D. C., for defendant.

PAUL, Chief Judge.

This is an action for the recovery of income taxes collected from the plaintiff for the calendar years 1949 and 1950, in the respective sums of $1,235.17 and $5,-434.98.

The plaintiff, which will hereinafter be referred to as the bank or the taxpayer, is a national banking association which has its principal office in the city of Charlottesville, Virginia. Among the customers of the bank over a period of years has been the Crozet Cold Storage Corporation, whose plant is located at the town of Crozet, some 12 or 14 miles from Charlottesville. During the period 1933 to 1935 the bank had acquired 140 shares of the common stock of the Cold Storage Corporation. This appears to have been

acquired from time to time from various individuals who had pledged the stock as collateral on loans or had turned it over to the bank in payment of indebtedness to the bank. The total cost to the bank of these 140 shares was $12,770.

In 1948 the Cold Storage Corporation, being short of capital, decided to raise additional funds through an issue of preferred stock which it offered to sell to its common stockholders. The latter, however, did not take up the entire issue of preferred; and the bank, to which the Cold Storage Corporation was heavily indebted at the time, agreed to accept 400 shares of the preferred stock in payment of $38,280 of the indebtedness owed to it by the Cold Storage Corporation. Therefore at the beginning of the year 1949 the bank owned 140 shares of the common stock of the Cold Storage Corporation, acquired at a cost of $12,770, and 400 shares of the preferred stock which had cost the bank $38,280.

On an examination of the bank made in February, 1949, by a federal bank examiner he was of opinion that the common stock of the Cold Storage Corporation (which the bank had held for some 15 or 16 years) was worthless and directed that it be written down to a nominal value of $1.

In October, 1949, another examination of the bank was made and at that time the examiner, after reviewing the financial status of the Cold Storage Corporation and noting that its operations continued at a loss, appraised the 400 shares of preferred stock as of no value and directed that this stock, which was carried on the books at a valuation of $38,280, be written off as a total loss. The sum of these write-offs was $51,049 ($12,769 on the common stock and $38,280 on the preferred). The stock, though charged off as an asset, remained in the bank's possession.

In filing its tax return for 1949 the bank erroneously added this amount to its reserve for bad debts. When agents of the Bureau of Internal Revenue finally audited this return, which apparently was some time subsequent to March 15, 1951, they held that this was not a proper addition to the reserve for bad debts and disallowed it. The bank then claimed that it was entitled to a deduction for the charge-off of this stock as a capital loss. Due to provisions of the income tax law, which need not be here gone into, the taxpayer could not charge off the entire loss for the year 1949, with the result that only $4,940.60 was claimed as a deduction for the year 1949. By the carry-over provisions of the law the taxpayer claimed a further deduction for the year 1950 in the amount of $21,739.92. Based on these claimed deductions the bank filed its claim for refund for overpayment of taxes in the amount of $1,-253.17 for the taxable year 1949 and for $5,434.98 for the year 1950—the amounts sued for in this action.

To avoid confusion it should be borne in mind that it was not until sometime after March 15, 1951, that the Bureau notified the bank that the alleged loss on the stock could not be added to the reserve for bad debts. The returns for both 1949 and 1950 had, of course, been filed prior to that time. Consequently it was sometime after both of these returns had been filed that the bank first made its claim of a deduction based on treating the loss on the stock as a capital loss, and it was in November, 1951, that it filed its claim for refund for the years 1949 and 1950 based on this theory. This lag in time was due to the lapse in time between the filing of a return and the time when the Bureau of Internal Revenue got around to reviewing it. When the claims for refund were filed (in November, 1951) they were finally rejected at some later date. It may be said parenthetically that the court understands that the taxpayer has filed similar claims for refunds for several subsequent years to which, if its position be correct, it would be entitled to under the carry-over provisions of the law. However, no claims for the years other than 1949 and 1950 are involved in this case.

In the meantime, in December, 1949, the taxpayer donated to the University

of Virginia Development Fund 105 shares of the 400 shares of preferred stock of the Cold Storage Corporation which it had in its possession. It did not take a deduction for this contribution in the tax return for that year. Again, in December, 1950, the bank made another donation to the University of Virginia Development Fund of 100 shares of the preferred stock of the Cold Storage Corporation and in its tax return for 1950 claimed a deduction therefor in the amount of $9,850, at a valuation of $98.-50 a share. On January 10, 1951, the taxpayer filed a claim for a refund of taxes based on the 105 shares of stock which it had donated in December, 1949, but for which it had taken no deduction in its return for that year. To this 105 shares of stock it attributed a value of $9,975, or $95 a share. In each instance the taxpayer stated that the amount of the claimed deduction was based on valuation of the stock by local brokerage houses at the times of the respective gifts. In both instances the deductions were allowed in the amounts claimed. It further appears that in its returns for each of the taxable years 1951, 1952, 1953 the taxpayer has claimed deductions for varying amounts of this same stock given to the same donee; and that all of these deductions have been allowed. Beginning with the tax year 1949 and running through the next four years the bank has given to the Development Fund a total of 341 shares of this stock for which it has been allowed deductions aggregating $33,257. We have here an unusual situation. In October, 1949, one arm of the Treasury Department, the office of the Comptroller, compelled the bank to charge off this stock as a total loss; while as of a date two months later and extending over several years thereafter another arm of the Treasury treated the stock as having a value very ·close to par for purposes of donations. Stating this anomaly otherwise, we find that the taxpayer who has claimed and received the benefit of a high valuation on the stock now sues for refunds based on the theory that the stock was worthless.

We must first inquire into the effect of the action of the examiner in directing the bank to charge off this stock. Government counsel contend with some earnestness that the taxpayer has not shown that the charge-off was directed because of a finding that the stock was worthless, and suggests that it was for other reasons. However, I think the evidence leads to the conclusion that the write-off was directed only because the stock was considered by the examiner as of no value. It is true that there is no substantial evidence showing an actual lack of any value. But it is clear, I think, that the reason for the examiner's action was his opinion that the stock was worthless. His entry on the official form appraising the value of the securities held by the bank in October, 1949, stated that the preferred stock was "Estimated as loss and written off during examination." Nothing appears there or elsewhere to indicate that there was any other reason for the charge-off.

The Internal Revenue Code of 1939, in effect in the years in question, provided, Sect. 23(g) (2), 26 U.S.C.A. § 23(g) (2).

"(2) Securities becoming worthless. If any securities (as defined in paragraph (3) of this subsection) become worthless during the taxable year and are capital assets, the loss resulting therefrom shall, for the purposes of this chapter, be considered as a loss from the sale or exchange, on the last day of such taxable year, of capital assets."

Regulations 111, Section 29.23(e)–4, as in effect during 1949, provided in part as follows:

"Federal or State authorities incident to the regulation of banks and certain other corporations may require that stock be charged off as worthless or written down to a nominal value. If, in any such case, the basis of the requirement is the

worthlessness of the stock, such charging off or writing down will, for income tax purposes, be considered prima facie evidence of worthlessness; but if the charging off or writing down is due to market fluctuations, or if no reasonable attempt has been made to determine worthlessness, no deduction for income tax purposes of the amount so charged off or written down can be allowed."

Since the examiner charged off this stock for the reason that he believed it worthless, the terms of the regulation quoted above seem to establish a prima facie presumption of worthlessness in favor of the taxpayer, which it would be incumbent upon the government to overcome. It must be said that the government has not of itself presented anything to rebut the presumption. There is no evidence showing any sale of the stock or quotations for sale or purchase. There is offered no analysis of the financial status of the company which might indicate to what extent the value of the stock was impaired. The government apparently places its reliance on the fact that the taxpayer, within a few months after the write-off, made a donation of the stock at a valuation approximating par and the statement of the taxpayer that it was advised and believed that this was a fair valuation at that time. It must be said that it is hardly logical to assume that stock which was worthless in October was worth near par in December. To accomplish this would require a startling upturn in the fortunes of the corporation, of which there is no evidence at all.

Except for the examiner's action in directing the charge-off and his apparent reason for doing so there is practically nothing to show that this stock was ever without any value. It may be that the affairs of the corporation were such that the stock was not inviting to investors. It may be that there was a shrinkage in its value. But a shrinkage in value, not carried to the point of worthlessness, could not, under the regulations, permit

of any deduction by the taxpayer. The fact remains that in September, 1948, the bank had acquired the 400 shares of preferred stock at a cost to it of $95.70 per share, and fifteen months later, in donating a part of it, valued it at $95 a share. It is hardly conceivable that between these dates there was a time when the stock was entirely worthless, and particularly at a time only two months prior to the last of these transactions.

It would appear that in ordering the stock written off in its entirety the examiner acted arbitrarily and without a real basis for such determination. And with this conclusion there comes into play a provision of the regulation heretofore quoted, Sect. 29.23(e)-4, which states "but if the charging off or writing down is due to market fluctuations, or *if no reasonable attempt has been made to determine worthlessness, no deduction* for income tax purposes of the amount so charged off or written down *can be allowed."* (Emphasis supplied.)

█ Summarizing the regulation Sect. 29.23(e)-4, I construe its effect to be in substance and as applicable here that when stock owned by a taxpayer becomes worthless its cost to him is deductible from income for the taxable year in which it becomes worthless, *provided a satisfactory showing is made of its worthlessness.* That, prima facie, this showing is made where a bank examiner has directed that the stock be charged off as worthless, provided that the action of the examiner is based on a reasonable attempt to ascertain whether the stock is in fact worthless.

█ There are, therefore, several reasons why the plaintiff is not entitled to recover in this case. In the first place I find that the examiner made no reasonable attempt to determine whether this stock was worthless, and for that reason no deduction for income tax purposes can be allowed for it.

In the second place I am of opinion that the taxpayer has not made a satisfactory showing that the stock was worthless and that any prima facie pre-

sumption to that effect arising from the examiner's action has been negatived by the evidence in the case. The fact that this evidence may have come from the taxpayer itself, from its records or from admissions of its agents, does not dispel its effect.

The taxpayer has urged that the presumption of worthlessness arising from the charge-off of this stock is—or should be—a conclusive presumption, such as is accorded to debts charged off as worthless under the provisions of Sect. 29–23(k)–1(e) of the regulations. The view is arrived at by pointing out that the statute, Sect. 23(g) (2) of the Internal Revenue Act of 1939, provides that a loss is allowed the taxpayer "If any securities * * * become worthless during the taxable year * * *"; while Sect. 23(k) (1) of the same Act grants a deduction for "Debts which become worthless within the taxable year". It is argued that there is a similarity of language here which indicates an intention that the securities mentioned in Sect. (g) (2) and the debts referred to in Sect. (k) (1) be treated alike. To quote the language of counsel the argument is this:

> "The question therefore arises why, if a charge off by an examiner of a debt as a bad debt is conclusive, a direction to charge off securities as worthless, made by the same examiner, should not be equally conclusive, in view of the fact that the statutes providing for the deductions are practically identical in language. This question becomes particularly pertinent when it is recalled that both regulations originally provided for a prima facie presumption only and the regulation with respect to bad debts was changed to provide for the conclusive presumption only after the Fourth Circuit Court of Appeals had decided that the action of the examiner should be deemed to be conclusive even though the regulation at that time provided only for the prima facie presumption. (See Citizens National Bank of Orange v. Commissioner [4 Cir.], 74 F.2d 604,

100 A.L.R. 699, discussed at length below.) After that decision the Commissioner changed the regulations as to bad debts to make the presumption conclusive but left unchanged the regulations as to securities charged off at the direction of a bank examiner."

The contention, as I take it, is that the Court of Appeals of this Circuit in the case cited held a presumption designated in the regulations as prima facie to be in fact a conclusive one as related to debts and that the Commissioner of Internal Revenue adopted this construction and amended the regulations as applied to worthless debts but not as to stocks. And it now urges that this court should construe the presumption of worthlessness to be conclusive as related to both classes of securities.

The answer to this argument seems plain. In the first place I do not interpret the case cited as holding that the presumption arising in that case was a conclusive one. On the contrary the opinion indicates clearly that the presumption of worthlessness was rebuttable. See Citizens' National Bank of Orange v. C. I. R., 4 Cir., 74 F.2d 604, at page 605 where the court says that the Regulation "gives to the taxpayer the benefit of the presumption that * * * the debt is worthless * * *. In the regulations the burden is thrown upon the respondent to establish the contrary." Citizens' Bank of Orange v. Commissioner was decided on the ground that the taxpayer was entitled to the benefit of a presumption which the government refused to recognize but made no attempt to rebut. I can see no reason for believing that the amendment of the regulations made after the decision of this case was forced because of the decision. The Treasury regulations are amended from time to time in various respects, and it was not inappropriate to draw a distinction in the treatment of worthless stocks held by a taxpayer and worthless debts owing him. The first are treated in the statute under the head of "Capital Loss-

es", Revenue Act of 1939, Sect. 23(g) (2), while the latter are under the heading of "Bad Debts", Sect. 23(k) (1). There is quite a difference between the two. The method of calculating losses and the extent of the allowable loss is not the same. Bad debts are deductible in full; losses on capital assets may be deductible only in part. Again, there is no danger to the revenue in the conclusive presumption as to bad debts, for if the debt is at anytime thereafter paid in full or in part the taxpayer must include the amount so paid in his current income. No such situation exists as to stock. Theoretically at least, and in most instances actually, the extent of loss in value of stock can be determined only when the owner has disposed of it. Here we have a case where, despite the fact that the examiner considered the stock worthless, the owner held on to it and shortly thereafter disposed of it at approximately what it had paid for it. It is true that the disposition was by gift but the taxpayer received credit for the value as a charitable contribution. It is for such reasons that the Treasury draws a logical and proper distinction between debts and stocks so far as presumptions of worthlessness are concerned.

It appears that the taxpayer still holds the 140 shares of common stock of the Cold Storage Corporation which an examiner wrote down to a value of $1 in February, 1949. So far as appears no attempt has been made to dispose of this stock. While most of the evidence and the discussion in this opinion has related to the preferred stock, I am of opinion that the considerations discussed apply also to the common stock. Here too no reasonable attempt was made to determine the worthlessness of the stock at the time it was written down. I am also of opinion that the evidence taken as a whole indicates this stock at that time had some value, and that the evidence is sufficient to overcome the prima facie presumption of worthlessness arising from the examiner's action.

Judgment will, therefore, be entered in favor of the defendant.